IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN (WATERLOO) DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 23-CR-02024-CJW |
| | ) | |
| vs. | ) | |
| | ) | |
| CHRISTOPHER WUCHTER, | ) | |
| | ) | |
| Defendant. | ) | |

**BRIEF IN SUPPORT OF GOVERNMENT'S RESPONSE TO DEFENDANT'S
MOTION TO DISMISS**

<u>**TABLE OF CONTENTS**</u>

**I. FACTS AND PROCEDURAL HISTORY** ............................................................................ 2

**II. DISCUSSION** ................................................................................................................... 3

    **A. The Second Amendment and Bruen** ..................................................................... 3

    **B. Title 18, United States Code Section 922(g)(3) is Constitutional post-Bruen** ........... 6

        **1. Prohibiting Unlawful Drug Users and Drug Addicts from Possessing
        Firearms is Consistent with this Nation's Historical Tradition of Firearm
        Regulation.** ........................................................................................................... 9

        **2. Section 922(g)(3): A Brief History** ................................................................ 11

        **3. Historical Analogues to Section 922(g)(3).** ..................................................... 13

    **C. Title 26, United States Code, Section 5861(d) is Constitutional post-Bruen** .......... 19

**III. CONCLUSION** .............................................................................................................. 23

    The United States submits the following brief in support of its resistance to

defendant's motion to dismiss the Indictment and Superseding Indictment. (R. Doc.

1

29.) For the reasons laid out below, the Court should deny defendant's motion to dismiss.

## I. FACTS AND PROCEDURAL HISTORY

On April 19, 2023, the grand jury returned an Indictment charging defendant with one count of possession of a firearm by a drug user, in violation of Title 18, United States Code, Section 922(g)(3). (R. Doc. 3.) Specifically, the Indictment alleged defendant was an unlawful user of marijuana and methamphetamine. (R. Doc. 3.) On June 28, 2023, the grand jury returned a Superseding Indictment charging defendant with the additional count of possession of national firearms destructive devices not registered to possessor. (R. Doc. 23.) Specifically, the Superseding Indictment alleged that defendant possessed a Browning Invector Plus BPS, 12-guage weapon, and a Sheffield Arms Co. 12-guage weapon; both weapons made from a shotgun and having an overall length of less than 26 inches or a barrel of less than 18 inches in length. (R. Doc. 23.) Neither weapon was registered to defendant in the National Firearms Registration and Transfer Record. (R. Doc. 23.)

On July 24, 2023, defendant filed a motion to dismiss the Indictment and Superseding Indictment arguing that Title 18, United States Code, Section 922(g)(3) and Title 26, United States Code, Section 5845(a)[1] are unconstitutional, relying upon the June 23, 2022, ruling by the United States Supreme Court in *New York*

---

[1] Defendant challenges the constitutionality of 26 U.S.C. § 5845(a), which outlines definitions for purposes of Title 26. However, defendant's argument challenges the constitutionality of possession of an unlicensed short-barreled shotgun under 26 U.S.C. 5861(d). Therefore, the government will address the constitutionality of 26 U.S.C. 5861(d).

*State Rifle and Pistol Association, Inc. v. Bruen*, which held unconstitutional the

State of New York's penal code provision that made it a crime to possess a firearm

outside the home without a license, when licensing required applicants to satisfy

"proper cause" by "demonstrate[ing] a special need for self-protection

distinguishable from that of the general community."  142 S.Ct. 2111, 2117 (2022);

R. Doc. 29.

## II.  DISCUSSION

### A.    *The Second Amendment and Bruen*

In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court

held that the Second Amendment protects the right of "law-abiding, responsible

citizens" to keep firearms in their homes for self-defense.  *Heller*, 554 U.S. at 635.

But *Heller* clarified that, "[l]ike most rights, the right secured by the Second

Amendment is not unlimited" and is "not a right to keep and carry any weapon

whatsoever in any manner whatsoever and for whatever purpose."  *Id*. at 626.

*Heller* said that "nothing in [its] opinion should be taken to cast doubt" on certain

"presumptively lawful regulatory measures," such as "longstanding prohibitions on

the possession of firearms by felons and the mentally ill," "laws forbidding the

carrying of firearms in sensitive places," and "laws imposing conditions and

qualifications on the commercial sale of arms."  *Id*. at 626-27 & n. 26.  In *McDonald*

*v. Chicago,* 561 U.S. 742 (2010), a plurality of the Court again emphasized that

applying the Second Amendment to the states "does not imperil every law

regulating firearms."  *McDonald*, 561 U.S. at 786 (opinion of Alito, J.).

3

*Bruen* held that the Second Amendment protects the right of "ordinary, law-abiding citizens" to "carry a handgun for self-defense outside the home." *Bruen*, 142 S. Ct. at 2122. It struck down a New York license-to-carry law that "prevent[ed] law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms." *Id.* at 2156. But, as Justice Kavanaugh emphasized in concurrence, "[p]roperly interpreted, the Second Amendment allows a 'variety' of gun regulations." *Id.* at 2162 (Kavanaugh, J., concurring) (quoting *Heller*, 554 U.S. at 636).

*Bruen* clarified the "standard for applying the Second Amendment." *Bruen*, 142 S. Ct. at 2129. First, "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 2129-30. Second, when the conduct is protected, "[t]he government must . . . justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130.

The Court explained that, "[i]n some cases," the inquiry into "whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding" will "be fairly straightforward." *Id.* at 2131. "For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* Similarly, the Court said, "if earlier generations addressed the societal problem, but did so through

materially different means, that also could be evidence that a modern regulation is unconstitutional." *Id.*

*Bruen* recognized, however, that "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791." *Id.* at 2132. Thus, when considering "modern regulations that were unimaginable at the founding," the historical inquiry will "often involve reasoning by analogy." *Id.* In "determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation," courts must determine "whether the two regulations are relevantly similar," which will involve considering "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132-33 (quotations omitted).

The Court emphasized that this "analogical reasoning . . . is neither a regulatory straightjacket nor a regulatory blank check." *Id.* at 2133. "On the one hand, courts should not 'uphold every modern law that remotely resembles a historical analogue' . . .." *Id.* (quoting *Drummond v. Robinson Twp.*, 9 F.4th 217, 226 (3d Cir. 2021)). "On the other hand, analogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin." *Id.* "[E]ven if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.*

**B.** **Title 18, United States Code Section 922(g)(3) is Constitutional post-Bruen**

Section 922(g)(3) criminalizes the possession of firearms by any person "who is an unlawful user of or addicted to any controlled substance." This restriction does not run afoul of the Second Amendment, because the right described by the Second Amendment only extends to "the people"—*i.e.* "law-abiding, responsible" citizens keeping or bearing arms for "lawful purposes." *See Heller*, 554 U.S. at 635; *Bruen*, 142 S. Ct. at 2156. In *Heller*, the Supreme Court held that "the Second Amendment does not protect those weapons not typically possessed by *law-abiding citizens* for lawful purposes." 554 U.S. at 625. This interpretation of the Second Amendment's meaning "accords with the historical understanding of the scope of the right." *Id.* Further, *Heller* expressly contemplated that certain citizens were "disqualified" from keeping or bearing arms under the Second Amendment. *Id.* at 635 ("Assuming that Heller is not disqualified from the exercise of Second Amendment rights, the District must permit him to register his handgun and must issue him a license to carry it in the home.").

Title 18, United States Code, Section 922(g)(3) was held to be constitutional before and after *Heller*. *See United States v. Seay*, 620 F.3d 919, 925 (8th Cir. 2010) (citing *United States v. Letts*, 264 F.3d 787, 789–90 (8th Cir.2001) (holding that § 922(g)(3) is not unconstitutional under the Commerce Clause following *United States v. Lopez*, 514 U.S. 549, (1995)). Following *Heller*, the Court of Appeals again upheld the constitutionality of § 922(g)(3), and this time specifically under the Second Amendment. *Seay*, 620 F.3d at 925.

*Bruen* does not abrogate *Seay*.  Had it done so, the law would nonetheless survive afresh scrutiny because, as observed in *Seay*, "922(g)(3) has the same "historical pedigree as other portions of § 922(g)" and "is the type of "longstanding prohibition on the possession of firearms" that *Heller* declared presumptively lawful.  *Id. at* 925 (quoting *Heller*).  History is full of historical analogues of laws that prohibited firearm possession by drug users or individuals addicted to drugs.  *See United States v. Lewis*, No. CR-22-368-F, 2023 WL 187582, at *4 (W.D. Okla. Jan. 13, 2023) (The court concludes that "§ 922(g)(3) is relevantly similar to regulations aimed at preventing dangerous or untrustworthy persons from possessing and using firearms, such as individuals convicted of felonies or suffering from mental illness," or individuals who are intoxicated.) and *United States v. Seiwert*, 2022 WL 4534605, at *2 (N.D. Ill. Sept. 28, 2022) ("In this case, § 922(g)(3) is relevantly similar to regulations aimed at preventing dangerous or untrustworthy persons from possessing and using firearms, such as individuals convicted of felonies or suffering from mental illness.").

The *Bruen* Court began its textual analysis by underscoring "that petitioners . . . —*two ordinary, law-abiding, adult citizens*—are part of 'the people' whom the Second Amendment protects."  142 S. Ct. at 2134.  *Bruen* did not question the constitutionality of "shall-issue" concealed-carry licensing regimes, employed by 43 states, that "require applicants to undergo a background check or pass a firearms safety course" to ensure that "those bearing arms" are "'law-abiding, responsible citizens.'"  *Id.* at 2138 n.9.  Because both *Bruen* and *Heller* define the right to bear

arms as belonging to "law-abiding, responsible" citizens, *Heller*, 554 U.S. at 635; *Bruen*, 142 S. Ct. at 2156, or "ordinary, law-abiding, adult citizens," *Bruen*, 142 S. Ct. at 2122, 2134, unlawful users of controlled substances fall outside the Second Amendment's protection. In sum, those who habitually, unlawfully use controlled substances are neither "law-abiding" or "responsible," and therefore are not guaranteed the right to possess firearms under the Second Amendment.

It is therefore unsurprising that the many states have adopted "shall-issue" licensing regimes which often deny carrying rights to unlawful users of and addicts to controlled substances. *See, e.g.*, Iowa Code § 724.15(2)(a-e) (providing that a person shall not acquire a firearm if the person is prohibited under federal law from possessing a firearm or is intoxicated); Iowa Code § 724.8 (providing a person may not be issued a permit to carry a concealed weapon if the person is prohibited from possessing a firearm under federal law; is addicted to alcohol, and other grounds); ALASKA STAT. 18.65.705 (providing a license shall issue if, among other things, the applicant "is not now in and has not in the three years immediately preceding the application been ordered by a court to complete an alcohol or substance abuse treatment program"); ARK. CODE. ANN. § 5-73-309 (providing a license shall issue if, among other things, the applicant "[d]oes not chronically or habitually abuse a controlled substance to the extent that his or her normal faculties are impaired"); TEX. GOV'T CODE ANN. § 411.172(a)(6) ("A person is eligible for a license to carry a handgun if the person . . . is not a chemically dependent person"). *Bruen*'s treatment of "shall-issue" laws lends greater support for the proposition that the

Second Amendment's text does not extend the right to keep and bear arms to habitually law-breaking citizens, such as unlawful users of controlled substances.

Moreover, excluding habitual lawbreakers from "the people" as contained in the text of the Second Amendment is consistent with scholarly opinions on the subject. As the Ninth Circuit observed in *United States v. Vongxay*,

> [M]ost scholars of the Second Amendment agree that the right to bear arms was "inextricably . . . tied to" the concept of a "virtuous citizen[ry]" that would protect society through "defensive use of arms against criminals, oppressive officials, and foreign enemies alike," and that "the right to bear arms does not preclude laws disarming the unvirtuous citizens (i.e. criminals) . . . ."

594 F.3d 1111, 1118 (9th Cir. 2010) (quoting Don B. Kates, Jr., *The Second Amendment: A Dialogue*, 49 LAW & CONTEMP. PROBS. 143, 146 (1986)); *see also* THOMAS M. COOLEY, A TREATISE ON CONSTITUTIONAL LIMITATIONS 40 (Boston, Little Brown & Co. 1890) (explaining that constitutions protect rights for "the People" excluding, among others, "the idiot, the lunatic, and the felon"). Accordingly, the plain text of the Second Amendment does not guarantee unlawful users of controlled substances the right to possess a firearm.

## 1. Prohibiting Unlawful Drug Users and Drug Addicts from Possessing Firearms is Consistent with this Nation's Historical Tradition of Firearm Regulation.

Section 922(g)(3) "is consistent with this Nation's historical tradition of firearm regulation." *See Bruen*, 142 S. Ct. at 2126. Under this part of the analysis, courts look to "historical analogies" to the challenged law to determine whether it resembles constitutionally accepted restrictions. *Id.* at 2132. "Like all analogical reasoning, determining whether a historical regulation is a proper analogue for a

distinctly modern firearm regulation requires a determination of whether the two regulations are 'relevantly similar.'" *Id.* Among the features that make regulations fit for comparison, is "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2133. Where a historical and modern regulation impose similar burdens for similar reasons, they are more appropriate for analogy. While certain firearms regulations may have direct analogies to permissible restrictions present at the founding, some comparisons may "require a more nuanced approach" due to "societal concerns or dramatic technological changes." *Id.* at 2132.

The lengthy historical analysis in *Bruen* warns of the various pitfalls in evaluating historical analogues. To assist courts in this endeavor, *Bruen* highlighted three historical indicators that a firearms regulation was unconstitutional. First, "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* at 2131. Second, where the societal problem has historically been addressed by means other than firearms regulation, that may serve as evidence that the challenged regulation is unconstitutional. *Id.* Third, if jurisdictions attempted to enact similar regulations that were rejected on constitutional grounds, "that rejection surely would provide some probative evidence of unconstitutionality." *Id.*

## 2. Section 922(g)(3): A Brief History

The Seventh Circuit, in *United States v. Yancey*, explored the legislative

history of Section 922(g)(3). *United States v. Yancey*, 621 F.3d 681, (7th Cir 2010).

The original version of that statutory provision was enacted as part of the Gun

Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1213, which amended the Omnibus

Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, 82 Stat. 197.  The

original version of Section 922(g)(3) read: "It shall be unlawful for any person— . . .

who is an unlawful user of or addicted to marihuana or any depressant or stimulant

drug . . . or narcotic drug . . . to ship or transport any firearm or ammunition in

interstate or foreign commerce."  Pub. L. No. 90-618, § 102, 82 Stat. 1213.  Section

922(g)(3) was subsequently amended by the Firearms Owners' Protection Act, to

more current language, incorporating the new federal terminology related to

"controlled substances."  Pub. L. 99-308, § 102, 100 Stat. 449 (1986).

The Gun Control Act provided a summary of Congress's purpose for the new

regulations contained in Section 922(g):

> The Congress hereby declares that the purpose of this title is to
> provide support to Federal, State, and local law enforcement officials in
> their fight against crime and violence, and it is not the purpose of this
> title to place any undue or unnecessary Federal restrictions or burdens
> on law-abiding citizens with respect to the acquisition possession, or
> use of firearms appropriate to the purpose of . . . personal protection, or
> any other lawful activity, and that this title is not intended to
> discourage or eliminate the private ownership or use of firearms by
> law-abiding citizens for lawful purposes . . .

Pub. L. No. 90-618, § 101, 82 Stat. 1213.  This prefatory purpose to the statute

accords with other contemporaneous legislative materials, which shed additional

light on what societal problems Congress sought to address with Section 922(g).  *See*

11

S. REP. NO. 90-1501, at 22 (1968) ("The ready availability; that is, the ease with which any person can anonymously acquire firearms (including criminals, juveniles without the consent of their parents or guardians, narcotic addicts, mental defectives, armed groups who would supplant duly constituted public authorities, and others whose possession of firearms is similarly contrary to the public interest) is a matter of serious national concern").

The Supreme Court has interpreted the Omnibus Crime Control Act and Safe Street Act, as amended by the Gun Control Act and subsequent amendments, as evincing a congressional purpose of keeping firearms out of the hands of criminals. *See Scarborough v. United States*, 431 U.S. 563, 572 (1977) (holding the legislative history of these statutes supports the view that Congress sought disarm those who may not be trusted to possess a firearm); *Barrett v. United States*, 423 U.S. 212, 220 (1976) (explaining that the "principal purpose" of federal gun control legislation "to make it possible to keep firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency"); *Huddleston v. United States*, 415 U.S. 814, 824 (1974) (same).

Prior to 1968, it appears Congress had not enacted a federal law criminalizing the possession of firearms by addicts or drug users. The federal regulation of controlled substances is a relatively recent invention beginning with the Harrison Narcotics Tax Act, Pub.L. 63–223, 38 Stat. 785 (1915). The first significant federal firearms regulation, the National Firearms Act of 1934, Pub. L.

No. 73-474, 48 Stat. 1236, did not include a provision covering conduct similar to Section 922(g)(3).

### 3. Historical Analogues to Section 922(g)(3).

As *Bruen* instructs, appropriate historical analogues to Section 922(g)(3) will be similar in "how and why the regulations burden a law-abiding citizen's right to armed self-defense." 142 S. Ct. at 2132–33. Section 922(g) is a statute that criminalizes the possession of firearms by various classes of people. "Congress enacted the exclusions in § 922(g) to keep guns out of the hands of presumptively risky people" including unlawful drug users and addicts. *See Yancey*, 621 F.3d at 683. A review of early colonial laws has not revealed any statutes that prohibited possession by unlawful drug users—likely due to the recency of public laws concerning drug-use and addiction. Nevertheless, appropriate historical analogues will likely be regulations that disarm individuals based on their unlawful behavior or impaired judgment. Indeed, the two most readily analogous firearms regulations are those that prohibit the possession of firearms by felons and those that prohibit possession by the mentally ill. *Id.* at 684–685.

Unlawful users of controlled substances, like felons, have engaged in criminal behavior. "[By prohibiting possession by felons,] Congress sought to rule broadly— to keep guns out of the hands of those who have demonstrated that they may not be trusted to possess a firearm without becoming a threat to society." *Scarborough*, 431 U.S. at 572 (internal quotation marks omitted). Similarly, the congressional intent in passing § 922(g)(3) was "to keep firearms out of the possession of drug abusers, a dangerous class of individuals." *United States v. Cheeseman*, 600 F.3d

270, 280 (3d Cir. 2010). Due to their willingness to engage in unlawful activity, Section 922(g) identifies both classes as being "presumptively risky" and unfit to possess firearms.

An unlawful user of a controlled substance may, in many cases, be proven to have greater contempt for the law than a mere felon because they will typically exhibit criminal behavior—*i.e.*, drug use—that is "consistent," "prolonged," and "contemporaneous" with the possession of firearms. *See United States v. Purdy*, 264 F.3d 809, 812 (9th Cir. 2001). Nevertheless, the historical treatment of felons under the Second Amendment is a close analogy to that of unlawful drug users. *See Bruen*, 142 S. Ct. at 2133 (requiring "historical *analogue*, not a historical *twin*.").

A robust discussion of the historical basis for prohibiting felons from possessing firearms is found in *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010). There the Seventh Circuit cited a report of the Pennsylvania ratifying convention, in which Pennsylvania's dissenters proposed amendments to the new Constitution. *Id.* at 640. The report has been positively cited by the Supreme Court in *Heller* as a "highly influential" "precursor" to the Second Amendment. 554 U.S. at 604. "The report asserted that citizens have a personal right to bear arms 'unless for crimes committed, or real danger of public injury.'" *Skoien*, 614 F.3d at 640. The Seventh Circuit also observed "[m]any of the states, whose own constitutions entitled their citizens to be armed, did not extend this right to persons convicted of crime." *Id.* (citing Stephen P. Halbrook, THE FOUNDERS' SECOND AMENDMENT 273 (2008)). In light of this history, the Seventh Circuit determined

Case 6:23-cr-02024-CJW-MAR   Document 32   Filed 07/31/23   Page 14 of 23

that "some categorical disqualifications are permissible" under the Second Amendment. *Id.* at 641.

This conclusion generally aligns with the historical practice of disarming people the Framers deemed to be dangerous or untrustworthy. *See Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 700 F.3d 185, 200 (5th Cir. 2012); Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 LAW & HIST. REV. 139, 157–60 (2007); Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487, 506–08 (2004) ("The law demonstrates that in a well-regulated society, the state could disarm those it deemed likely to disrupt society."). Although many of these laws were motivated, at least in part, by racial animus, they are nevertheless quintessential features of "this Nation's historical tradition of firearm regulation." *See Bruen*, 142 S. Ct. at 2126. Against this historical backdrop of disarmament, it is no surprise that every circuit to decide the issue has held statutes prohibiting felons from possessing firearms does not violate the Second Amendment. *See, e.g.*, *United States v. Vongxay*, 594 F.3d 1111, 1114 (9th Cir. 2010); *United States v. Everist*, 368 F.3d 517, 519 (5th Cir. 2004); *Stimmel v. Sessions*, 879 F.3d 198, 210 (6th Cir. 2018); *United States v. Rozier*, 598 F.3d 768, 771 (11th Cir. 2010); *In re U.S.*, 578 F.3d 1195, 1200 (10th Cir. 2009).

Regulations concerning unlawful users of controlled substances are also analogous to regulations prohibiting the possession of firearms by the mentally ill.

It should be uncontroversial that both classes consist of people who may present diminished mental capacity or impaired judgment.[2] *Yancy*, 621 F.3d at 685 (observing "habitual drug abusers, like the mentally ill, are more likely to have difficulty exercising self-control, making it dangerous for them to possess deadly firearms.").

Colonial society at the time of the founding did not view persons with mental illness as being among those who could bear arms without "real danger of public injury." *Skoien*, 614 F.3d at 640. "[M]ost scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry," which did not include individuals with a history of mental illness. United States v. *Yancy*, 621 F.3d 681, 684–85 (7th Cir. 2010); *see also* Robert Dowlut, *The Right to Arms: Does the Constitution or the Predilection of Judges Reign?*, 36 OKLA. L. REV. 65, 96 (1983) ("Colonial and English societies of the eighteenth century, as well as their modern counterparts, have excluded infants, idiots, lunatics, and felons [from possessing firearms]."). Such individuals were often removed from the community at large through home confinement or involuntary commitment to welfare and penal institutions. *See, e.g.*, Gerald N. Grob, *The Mad Among Us: A History of the Care of*

---

[2] Title 27 C.F.R. § 478.11(a), containing the companion regulations to Section 922, defines "mental defective" as those determined, "as a result of marked subnormal intelligence, or mental illness, incompetency, condition, or disease: [i]s a danger to himself or to others; or (2) [l]acks the mental capacity to contract or manage his own affairs." The Code defines that an "unlawful user of or addicted to any controlled substance" as "[a] person who uses a controlled substance and has lost the power of self-control with reference to the use of controlled substance; and any person who is a current user of a controlled substance in a manner other than as prescribed by a licensed physician." 27 C.F.R. § 478.11(a).

*America's Mentally Ill* 5-21, 29, 43 (1994).  Moreover, "in eighteenth-century America, justices of the peace were authorized to 'lock up' 'lunatics' who were 'dangerous to be permitted to go abroad'" Carlton F.W. Larson, *Four Exceptions in Search of a Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 HASTINGS L. J. 1371, 1377 (2009).  These historical realities strongly suggest that the Framers did not understand the Second Amendment to guarantee those with mental illness the unqualified right to possess a firearm.

Critically, *Heller* held that the "longstanding prohibitions on the possession of firearms by felons and the mentally ill" comport with the Second Amendment, which only protects the "right of law-abiding, responsible citizens" to possess a firearm.  *Heller*'s commentary is not mere dicta.  *Vongxay*, 594 F.3d at 1115.  The Supreme Court has repeatedly assured the presumptive validity of such laws under its Second Amendment holdings.  *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 786 (2010).

*Bruen* did nothing to disturb the decision in *Heller*.  It only reiterated that the Second Amendment "is neither a regulatory straitjacket nor a regulatory blank check."  *Bruen*, 142 S. Ct. at 2133.  Justice Kavanaugh, joined by Chief Justice Roberts in a concurring opinion, noted the "presumptively lawful regulatory measures" described in *Heller*, including the "longstanding prohibitions on the possession of firearms by felons and the mentally ill . . . ."  *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring).  Moreover, Justice Kavanaugh's concurrence observed that *Bruen* only concerned "may-issue" licensing regimes.  *Id.*  It did not reach

"shall-issue" licensing regimes—which commonly disqualify felons, the mentally ill, and drug users. *Id.* These regimes, Justice Kavanaugh suggests, are likely constitutional. *Id.* ("Going forward, therefore, the 43 States that employ objective shall-issue licensing regimes for carrying handguns for self-defense may continue to do so.").

Both history and the Supreme Court's Second Amendment jurisprudence strongly demonstrate that disarming unlawful users of controlled substances is "consistent with this Nation's historical tradition of keeping guns from those engaged in criminal conduct." *United States v. Garcia*, No. 23-CR-2018-CJW, slip op at 3, (N. D. Iowa June 8, 2023); *See United States v. Gil,* No. EP-22-CR-773-DB, 2023 WL 4356067 (W.D. Tex. July 5, 2023); *United States v. Overholser*, No. 3:22-CR-35 JD, 2023 WL 4145343 (N.D. Ind. June 23, 2023); *United States v. Evenson*, No. CR-23-24-BLG-SPW, 2023 WL 3947828 (D. Mont. June 12, 2023); *United States v. Walker*, No. 8:22-CR-291, 2023 WL 3932224 (D. Neb. June 9, 2023); *United States v. Deng*, No. 4:23-CR-41, (SD Iowa, May 18, 2023) (unpublished); *United States v. Le*, No. 23-CR-14, (SD Iowa, April 11, 2023) (unpublished); *United States v. Stennerson*, No. CR 22-139-BLG-SPW, 2023 WL 2214351 (D. Mont. Feb. 24, 2023); *United States v. Posey*, No. 2:22-CR-83 JD, 2023 WL 1869095 (N.D. Ind. Feb. 9, 2023); *United States v. Lewis*, No. CR-22-368-F, 2023 WL 187582 (W.D. Okla. Jan. 13, 2023); *United States v. Black*, No. CR 22-133-01, 2023 WL 122920 (W.D. La. Jan. 6, 2023); *United States v. Connelly*, No. EP-22-CR-229(2)-KC, 2022 WL 17829158 (W.D. Tex. Dec. 21, 2022), on reconsideration, No. EP-22-CR-229(2)-KC,

2023 WL 2806324 (W.D. Tex. Apr. 6, 2023); *United States v. Seiwert*, No. 20 CR 443, 2022 WL 4534605 (N.D. Ill. Sept. 28, 2022); *United States v. Daniels*, 610 F. Supp. 3d 892 (S.D. Miss. 2022); *United States v. Hart*, No. 4:22-00114-CR-W-HFS, 2023 WL 4144834 (W.D. Mo. June 6, 2023), report and recommendation adopted, No. 22-00114-CR-W-HFS, 2023 WL 4141044 (W.D. Mo. June 22, 2023); *but see United States v. Harrison*, No. CR-22-00328-PRW, 2023 WL 1771138 (W.D. Okla. Feb. 3, 2023) (appeal pending *United States v. Harrison*, No. 23-6028, (10th Cir. March 3, 2023); *United States v. Connelly*, No. EP-22-CR-229(2)-KC, 2023 WL 2806324 (W.D. Tex. Apr. 6, 2023) (appeal pending United States v. Connelly, No. 23-50312, (5th Cir. May 04, 2023).

### C. Title 26, United States Code, Section 5861(d) is Constitutional post-Bruen

Defendant is also charged with failure to register a short-barreled shotgun, which is a type of "firearm" under 26 U.S.C. § 5845(a) that can only be lawfully possessed if registered with the federal government pursuant to 26 U.S.C. § 5841 of the National Firearms Act (NFA). Defendant moves to dismiss this charge, arguing that the restrictions imposed by § 5841(d) violate the history and traditions of the Second Amendment because the restrictions on barrel length were not imposed until long after the Second Amendment was ratified, a time when "crime was an existent problem and short barreled shotguns were common use". (R. Doc. 29.)

The Supreme Court has stated that the Second Amendment does not protect "dangerous and unusual weapons." *Bruen*, 142 S. Ct. at 2143 (quoting *Heller*, 554 U.S. at 627). That is, "the Second Amendment does not protect those weapons not

typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns." *Heller*, 554 U.S. at 625.

In an unpublished opinion, the Ninth Circuit applied that precedent to short-barreled rifles and held that there was no "right to possess" them. *United States v. Gilbert*, 286 F. App'x 383, 386 (9th Cir. 2008). The Tenth Circuit reached a similar conclusion, deeming short-barreled rifles "close analogues" of short-barreled shotguns that "fall[] outside the Second Amendment guarantee." *United States v. Cox*, 906 F.3d 1170, 1185 (10th Cir. 2018). The Eighth Circuit too rejected a challenge to the ban on unregistered short-barreled rifles, albeit on plain-error review. *See United States v. Stepp-Zafft*, 733 F. App'x 327, 329 (8th Cir. 2018) (unpublished). This Court should follow the same path as nothing in *Bruen* points to a different conclusion. As Justice Alito noted, the opinion "does not decide anything about the kinds of weapons that people may possess." *Bruen*, 142 S. Ct. at 2147 (Alito, J., concurring).

The Court reiterated that the Second Amendment does not protect "dangerous and unusual weapons" and cited a passage from *Heller* that quoted *Miller* as support. *Bruen*, 142 S. Ct. at 2143 (quoting *Heller*, 554 U.S. at 627). Justice Kavanaugh, joined by Chief Justice Roberts, likewise cited portions of *Heller* that cited *Miller* and confirmed the constitutionality of bans on dangerous and unusual weapons. *Id.* at 2162 (Kavanaugh, J., concurring). Thus, *Bruen* is consistent with prior precedent from the Supreme Court on the issue and with circuit-court precedent addressing short-barreled firearms.

### 1. **The law banning unregistered short-barreled firearms is supported by analogous historical laws banning dangerous and unusual weapons.**

Defendant's challenge to the constitutionality of 5861(d) would fail even if the Court were to give it fresh consideration without looking to earlier precedent. At the time of the Second Amendment's ratification, regulations of dangerous and unusual weapons were well-accepted. *See Bruen*, 142 S. Ct. at 2143; *Heller*, 554 U.S. at 627. So were regulations targeting the concealment of even those weapons that were *not* dangerous and unusual. *See Bruen*, 142 S. Ct. at 2150 ("The historical evidence from antebellum American" shows that "States could lawfully eliminate one kind of public carry—concealed carry—so long as they left open the option to carry openly."); *Robertson v. Bald-win*, 165 U.S. 275, 281-82 (1897) (stating in *dicta* that "the right of the people to keep and bear arms (article 2) is not infringed by laws prohibiting the carrying of concealed weapons"). Thus, short-barreled shotguns may be banned because they are dangerous and unusual concealable weapons.

"It is of course clear from the face of the Act that the [National Firearms Act]'s object was to regulate certain weapons likely to be used for criminal purposes, just as the regulation of short-barreled rifles, for example, addresses a concealable weapon likely to be so used." *United States v. Thompson/Ctr. Arms Co.*, 504 U.S. 505, 517 (1992) (plurality opinion); *see also id.* at 526 (Stevens, J., dissenting) ("This statute serves the critical objective of regulating the manufacture and distribution of concealable" and "dangerous weapons."). The law's history, which indicates that

it was passed to address violence by targeting concealed weapons, confirms this. *See United States v. Gonzales*, No. 10CR967-CW, 2011 WL 5288727, at *4 & n.3 (D. Utah. Nov. 2, 2011) (unpublished).  In other words, "a long gun with a shortened barrel is both dangerous, because 'its concealability fosters its use in illicit activity,' and unusual, 'because of its heightened capability to cause damage.'" *Cox*, 906 F.3d at 1185 (quoting *United States v. Marzzarella*, 614 F.3d 85, 95 (3d Cir. 2010)).

Short-barreled shotguns are a far cry from common weapons like handguns, "the most popular weapon chosen by Americans for self-defense in the home," in both nature and number.  *Heller*, 554 U.S. at 629.  Indeed, the number of common weapons like pistols, revolvers, rifles, or shotguns produced in a single year far exceeds the *total* number of registered short-barreled shotguns.  *See* United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, Firearms Commerce in the United States: Annual Statistical Update 2, 16 (2021), https://www.atf.gov/firearms/docs/report/2021-firearms-com-merce-report/download.  Even compared to the class of dangerous and unusual weapons covered by the National Firearms Act, short-barreled shotguns are relatively uncommon.  Notably, there are fewer registered short-barreled shotguns (less than 200,000) than destructive devices (3.3 million), machine guns (over 700,000), and silencers (2.6 million).  *See id*. at 2.  There is thus ample reason to deem short-barreled shotguns dangerous and unusual weapons that legislatures may ban or otherwise regulate.

Defendant fails to address these points.  He does not explain why short-barreled shotguns are not dangerous and unusual, nor explain why the law here is

unconstitutional as applied to short-barreled shotguns.  Therefore, the Court should reject defendant's constitutional challenge to § 5861(d) and § 5845(a).

## III.   CONCLUSION

The Court should deny defendant's motion to dismiss the Indictment and Superseding Indictment.

Respectfully submitted,

TIMOTHY T. DUAX
United States Attorney

By: */s/ Ashley L. Corkery*

ASHLEY L. CORKERY
Assistant United States Attorney
111 7th Ave SE, Box 1
Cedar Rapids, IA 52401
(319) 363-6333,
(319) 363-1990 - Fax
Ashley.Corkery@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that on July 31, 2023, I electronically filed the foregoing with the Clerk of Court using the ECF system which will send notification of such filing to the parties or attorneys of record.

UNITED STATES ATTORNEY

BY: */s/ mas*